Filed 12/24/20  J.R. v. Superior Court CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| J.R.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | H048420<br>(Santa Clara County Super. Ct. Nos. 18JD025153, 18JD025155) |

Petitioner J.R. is the father of Z.H-M., Gi.D., and Ga.D., who are dependents of the Santa Clara County Juvenile Court.  Father petitions for extraordinary writ relief from a juvenile court order concerning Z.H-M. and Ga.D., entered after a contested, combined 12-, 18-, and 24-month review hearing.  The order terminated father's family reunification services for Z.H-M. and Ga.D. and directed that a selection and

implementation hearing be set for the two children under Welfare and Institutions Code section 366.26.[1]

Father contends that the juvenile court abused its discretion by concluding that returning Z.H-M. and Ga.D. to his care and custody would create a substantial risk to their physical or emotional well-being. Father further asserts that he was not afforded reasonable reunification services regarding visitation. For the reasons set forth below, we deny father's writ petition.

## I. FACTS AND PROCEDURAL BACKGROUND

In April 2018, the Santa Clara County Department of Family and Children's Services (Department) filed juvenile dependency petitions concerning nine-year-old Z.H-M., eight-year-old Gi.D., and six-year-old Ga.D. The Department alleged that father had perpetrated domestic violence against his live-in partner, C.C., in the children's presence. During the domestic violence incident, Gi.D. stepped in front of his father to thwart the attack on C.C. Father turned on Gi.D., slapped and scratched his arm, and caused him pain. The Department took Z.H-M., Gi.D., and Ga.D. (the children) into protective custody. Shortly thereafter, the children were placed with C.C.[2]

A. *Proceedings, Reports, and Factual Background Preceding the August 2020 Contested, Combined Review Hearing*

In early August 2018, the juvenile court sustained amended juvenile dependency petitions and found the children came within Welfare and Institutions Code section 300, subdivisions (a), (b), (c), and (g).[3] The court ordered the children removed from father and that family reunification services be provided to father. As part of father's case plan,

---

[1] The juvenile court also ordered that Gi.D. be returned to father's care with supervision and family maintenance services. In this writ proceeding, father challenges only the juvenile court's order concerning Z.H-M. and Ga.D.

[2] In the past, father and the mother of the children, T.H. (mother), "had reportedly engaged in significant bouts of Intimate Partner Violence (IPV) in the presence of the children . . . resulting in emotional harm to all of the children."

[3] Unspecified statutory references are to the Welfare and Institutions Code.

2

the court ordered father to complete a parent orientation class, a nurturing-father parenting class, a 16-week parenting without violence class, individual counseling, and a 52-week batterer's intervention program.

Later in August 2018, father again perpetrated intimate partner violence against C.C. Soon thereafter, the children were moved to a foster placement.

In January 2019, the juvenile court conducted a six-month review hearing. The court adopted the recommendations of the Department that the children remain in out-of-home care and father continue to receive family reunification services. The court also set a 12-month review for June 2019.

On February 3, 2019, the children were moved to their third foster placement because their second foster caretaker had been unable to manage Gi.D.'s and Ga.D.'s behavior, including their violence toward each other. Subsequently, in early May 2019, Gi.D. was placed at St. Vincent's School for Boys (St. Vincent's), a short-term residential treatment program. That placement occurred after the children's third foster caretakers had reported their inability to manage Gi.D.'s behavior.[4]

In a status review report prepared for the June 2019 12-month review, the Department recommended the children remain in out-of-home care and that father continue to receive family reunification services. The reporting social worker, Raymond Gonzalez, stated that father had completed several components of his court-ordered case plan. Father also had made progress in individual therapy and had requested additional therapy sessions. But, according to Gonzalez, father's "communication and behavior towards the department, service providers, the children's foster parents, children's school

---

[4] Gi.D. remained at St. Vincent's until March 20, 2020. Between that date and the August 2020 hearing at issue in this writ proceeding, Gi.D. lived apart from his siblings in two different foster homes. In contrast, Z.H-M. and Ga.D. continued to live together in the same foster placement from February 2019 to August 2020.

3

personnel, biological mother and his children for the most part ha[d] ranged from what could be interpreted as contentious to dangerous."

Gonzalez observed that father had not been able to "demonstrate lasting and consistent behavioral changes during th[e] reporting period and he ha[d] continued to have a relationship with his partner [C.C.]." In addition, regarding visitation, Gonzalez noted that father had not been able to "abide by visitation rules," had been "chronically late" to visits, had been "unable to manage the children's behaviors," had not "accepted feedback well" from supervising staff, and had "triggered the children to the point [] they became violent."

In an addendum report filed on August 21, 2019, the Department again recommended that the children remain in out-of-home care and that father continue to receive family reunification services. Social worker Gonzalez reported that father had contacted a Department supervisor in late June 2019 and asked not to be contacted by Gonzalez any longer and said he wanted a new social worker.[5] Gonzalez also reported on difficulties that had occurred in Child-Family Team (CFT) meetings with father, including father's argumentativeness and resistance to feedback or interventions designed to address the trauma experienced by the children.

Regarding father's visits with the children, Gonzalez said the visits had recently improved with respect to father's decreasing use of foul language, interactions with staff, and acknowledgement of the children's needs. Z.H-M. and Ga.D. told Gonzalez in late July 2019 that "they would like to have a visit with their father at a park." Gonzalez noted that father could benefit from continuing services "to support him with validating

_____

[5] In testimony at a subsequent 12-month permanency hearing, father denied asking the supervisor to remove Gonzalez. Ultimately, in late October 2019, a different social worker, Michael Vasquez, was assigned to the family. Vasquez had previously facilitated communication between father and social worker Gonzalez and had assisted with visitation.

[Z.H-M. and Ga.D.] and acknowledging their interest and autonomy to increase their self-esteem and reduce their trauma."

Gonzalez further reported that since March 2019, father had "improved from a 1 (poor) to a 2 (marginal)" on the "Beliefs and Behavior Assessment" in his batterer's intervention program. Father was scheduled to complete the 52-week program by April 1, 2020.

On August 21 and 22, 2019, the juvenile court held a contested 12-month permanency hearing under section 366.21, subdivision (f). Thereafter, the court issued an order terminating father's family reunification services and setting the matter for a selection and implementation hearing under section 366.26. The court found, among other things, that return of the children to father's care would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being and reasonable services designed to aid father to overcome the problems that led to removal of the children had been offered or provided.

Father challenged the juvenile court's order by filing a petition for extraordinary writ in this court. (*J.R. v. Superior Court of Santa Clara County* (Feb. 5, 2020, H047279) [nonpub. opn.].)[6] In February 2020, we concluded the juvenile court prejudicially erred

---

[6] The Department requests that we take judicial notice of the record in the prior writ proceeding. Father cites to the prior record in his current writ petition, but the prior record was not included in the current record. Moreover, two departmental reports that are in the prior record were admitted into evidence at the August 2020 hearing at issue in this writ proceeding. Father has not opposed the Department's request for judicial notice. Accordingly, we take judicial notice of the prior record in case No. H047279. (See Evid. Code, §§ 452, subd. (d), 459; see also *Roberson v. City of Rialto* (2014) 226 Cal.App.4th 1499, 1503, fn. 3.) We also take judicial notice, on our own motion, of our unpublished opinion in the prior writ proceeding, *J.R. v. Superior Court of Santa Clara County*, *supra*, H047279. (See Evid. Code, §§ 452, subd. (d), 459; see also *In re I.A.* (2019) 40 Cal.App.5th 19, 21, fn. 1.)

In addition, the Department requests that we take judicial notice of five Santa Clara County Superior Court temporary emergency orders that addressed dependency court-ordered visitation in light of the COVID-19 pandemic. The orders were filed on

by admitting the August 21, 2019 addendum report at the contested hearing because the report had not been timely provided to father. (*J.R. v. Superior Court of Santa Clara County*, *supra*, H047279 at pp. 14, 18–19.) Accordingly, we granted father's petition for extraordinary writ and directed the juvenile court to vacate its order and conduct a new hearing to re-determine the issue of termination of reunification services. (*Id*. at pp. 19–20.)

While father's writ petition in this court was pending, mother attempted suicide and subsequently died in December 2019. In addition, before we ruled on father's writ petition, the Department in late December 2019 completed a section 366.26 report.

In anticipation of a new 12-month permanency hearing under section 366.21, subdivision (f), the Department filed an addendum report in March 2020. In that report, the Department recommended that the juvenile court continue to provide father family reunification services and that Z.H-M., Gi.D., and Ga.D. remain in out-of-home care. The report stated Z.H-M. and Ga.D. were "thriving and well-adjusted to their [foster] placement."

The March 2020 addendum report also observed that father had been "consistent with his visitation with his children" and had "made moderate progress on his case plan services." Father's therapist reported that father exhibited the diagnostic criteria for Post-Traumatic Stress Disorder (PTSD). Father rarely missed his therapy sessions and was consistently respectful to his therapist. According to the therapist, father's "love for his kids has humbled him to change his behaviors and practice responses for when anger erupts from his children." "He is understanding his triggers and even showed strong awareness of how his behavior impacts his children's own triggers" and "has been working hard and been open with his emotions and frustrations." However, the

March 19, April 13, April 30, May 29 and July 15, 2020, and were in effect while some of the visitation at issue in this writ proceeding occurred. We grant the Department's unopposed request. (See Evid. Code, §§ 452, subd. (d), 459.)

6

addendum report disclosed that father "showed concerns of erratic behavior" and had been dropped from his batterer's intervention program (although he subsequently re-started it with a new provider).

As for visitation, Ga.D. "expressed liking visitations with her father." Z.H-M. "expressed he is ok with visitation with his father."[7] Further, the addendum report explained that "there are ongoing challenges with stability, inappropriate comments and inappropriate behavior in [father's] visitations with his children despite coaching and support from staff." The reporting social worker, Michael Vasquez, had received "several incident reports" regarding "visitation that are of concern." Specifically, the addendum report documented incidents that had occurred between father and Gi.D. during visits at St. Vincent's on November 2, 2019 (with all the children present) and November 30, 2019 (with only Gi.D.). The incidents included father "making inappropriate comments and making aggressive escalated statements to staff making them feel uncomfortable, fearful and unsafe." After these incidents, father was banned from St. Vincent's.

In addition, the addendum report explained "there ha[d] been challenges with the father [] discussing his case details with the children in visitations despite signing a visitation guidelines and rules document detailing appropriate conversation in visitations with the children." By way of example, the addendum report described concerning interactions between father and Gi.D., as well as between father and supervising personnel, at a visit on February 1, 2020.

On June 25, 2020, father filed a petition under section 388 asking the juvenile court to modify its prior visitation order to permit unsupervised visits. That same day, at

_____

[7] Regarding the frequency and duration of father's visitation, on January 28, 2019, the juvenile court ordered that father receive at least two supervised, therapeutic one-hour visits per week with the children. After the August 2019 12-month permanency hearing, the court increased visitation to a minimum of two supervised visits per week for two hours each.

a proceeding before the juvenile court, father requested a trial on the Department's latest recommendations. The juvenile court set the contested hearing for August 2020, as a combined 12-, 18- and 24-month review to include consideration of father's petition regarding visitation.

In addition, at the June 25, 2020 proceeding, counsel for the children informed the juvenile court that Z.H-M. did not want to attend in-person visits with father due to concerns about COVID-19 and the safety of visits. Z.H-M. also did not wish to attend visits without Ga.D., who similarly did not want to attend in-person visits. As for Gi.D., he had told counsel he did not wish to see father anymore.

Ga.D. was present at the June 25, 2020 proceeding before the juvenile court and told the court that she "d[id] not want to go home to [her] dad because of certain reasons." She said father "hits us sometimes. He does shout at us, and he does get angry at us quite a bit. So I do not want to go home to my dad, and I would like to stay here and get -- if we do get adopted, I wish to stay here."

On July 10, 2020, the Department filed a response to father's section 388 petition. The response described father's visitation historically as "inconsistent in quality and stability." In addition, the response noted that father "transitioned to video and audio visitation calls with all of his children" after the March 2020 COVID-19 shelter-in-place order. The video and audio visits included "challenges," such as "power struggles, yelling, cursing and casting [Ga.D.] out of visitations for being 'rude,' " which demonstrated father's lack of "ability [] to mitigate his children's behavior" and lack of "understanding of his children's trauma history." Although some of the visitation calls went "well" and "without incident," there were "considerable amounts of visitations" that turned "problematic, chaotic, and unstable." Further, the report noted that the children "appear to express resistance to visitations" and father "has been unable to cordially manage not getting upset at statements the children make in visits."

8

In a combined 18- and 24-month status review report filed on July 16, 2020, the Department continued to recommend that the children remain in out-of-home care, but newly recommended that the juvenile court terminate father's family reunification services and set a section 366.26 hearing to establish a permanent plan for the children.

The combined 18- and 24-month status review report observed that Z.H-M. and Ga.D. appeared to be comfortable, happy, and doing well in their current foster placement (where they had resided since February 2019). Z.H-M. and Ga.D. had told social worker Vasquez that they preferred to remain with their current caretakers, and Ga.D. said she would like to be adopted by them. In contrast, Gi.D.'s foster placement (his second after his discharge from St. Vincent's) was not a prospective adoptive home, and no viable relatives or extended family members had come forward for placement. Gi.D. had told Vasquez, variably, that he wanted to live with his prior caretakers and that he wanted to live with his father.

The report explained that father had continued to "engage in his Court ordered case plan services and has been consistent with audio/video and more recently in person visitations." Father had completed his 52-week batterer's intervention program in March 2020. In addition, father continued making progress in his individual therapy (his only remaining case-plan service), which focused on anger management and PTSD. He also voluntarily engaged in a parenting course.

Regarding visitation, 38 audio/video calls occurred between father and the children from mid-March to the end of June 2020.[8] After mid-June 2020, father had three, in-person visits with Gi.D., and those visits went well. In contrast, Z.H-M. and Ga.D. (as well as their caretakers) continued to be apprehensive about in-person visitation due to COVID-19. The Department explained the steps it was taking to promote in-person visitation. The efforts included Vasquez directly encouraging Z.H-M. and Ga.D.

_____

[8] After the March 2020 COVID-19 shelter-in-place order, father and the children had three scheduled video/audio calls per week.

to attend visits, exploring Z.H-M.'s and Ga.D.'s fears with their caretakers, discussing with the caretakers their own concerns regarding COVID-19, and requesting that the caretakers encourage visitation (which they agreed to do). Further, Z.H-M.'s and Ga.D.'s resistance to visitation was addressed at a CFT meeting and the clinical support teams were "implored to provide guidance and support" to the children regarding in-person visits.

The combined 18- and 24-month status review report reiterated that many of the visitation calls went well. The report also described incidents during visits that demonstrated the children's resistance to visiting with father. The report explained that father "needed redirection due to inappropriate discussion" and had become upset by the children's comments during visits. For example, father made "inappropriate statements" regarding his desire to have Z.H-M. and Ga.D. removed from their caretakers. He persisted in making the statements despite warnings and attempts at redirection by the supervising social worker, which resulted in termination of the visit. In addition, Vasquez described "considerable challenges" in dealing with father with regard to scheduling visitation. Further, Vasquez reported that father "demonstrated troubling behavior" toward Vasquez and his supervisor, including many "personal verbal attacks," "insults and foul language."

Vasquez explained father was "not ready for un-supervised visitations or to have the children returned to his care at this time. [Father] ha[d] not fully alleviated the risk factors that brought him and his children to the attention of the Court." Father "ha[d] not fully demonstrated that he has meaningfully absorbed his engagement with his Court ordered case plan services on a consistent basis" or "a clear understanding that he has made the behavioral changes necessary to be able to parent all of the children safely."

In an addendum report filed on August 21, 2020, Vasquez noted that father had "maintained consistent un-supervised in person and telephone call visitation" with Gi.D. and "maintain[ed] supervised telephone contact with his children [Ga.D.] and [Z.H-M.,]

10

with no in person visitation as yet." Father's visitation with Gi.D. continued to "progress and go well." During a visitation call between father and Z.H-M. and Ga.D. on August 7, 2020, father again questioned both children about visitation, and they subsequently refused visitation calls on three occasions. In addition, Ga.D. and Z.H-M. continued their resistance to in-person visitation, though Z.H-M. vacillated on this. The Department continued its effort to address the issue with the family, the children's caretakers, and their service providers and encourage in-person visitation. Ga.D. had agreed to attend therapeutic sessions with father to discuss her opposition to visits.

Regarding placement, Ga.D. had told Vasquez she enjoyed living with Z.H-M. and her caretakers, wanted to remain in their home long term, and did not want to return to father's care. Z.H-M. similarly had told Vasquez that he wished to remain with his caretakers long term and not return home to father. In contrast, Gi.D. had "recently begun reporting [that] returning home to his father [] would be his primary choice" and he did not like living at his current foster home very much.

According to Vasquez, returning Z.H-M. and Ga.D. to father's care would be detrimental to their emotional and physical well-being, based on father's history of "an inability to control his angry and aggressive impulses and outbursts and his emotional and mental manipulation of all those that he interacts with." In addition, father "demonstrated a lack of accountability and understanding regarding his role in th[e] deterioration of relationships with [Z.H-M. and Ga.D.,] placing his interests above theirs. [Father] continues to minimize his past and current behavior and how it has affected [Z.H-M. and Ga.D.]." Further, Vasquez reported that Z.H-M. and Ga.D. continued to thrive with their current caretakers and had "extensive bonds" with them given the "instrumental" emotional support they provided when mother died in December 2019.

Vasquez found "no significant evidence" to support father's allegations that the caretakers were "sabotaging his reunification with his children." In addition, Vasquez acknowledged that Gi.D. had "progressed on a very different track of reunification and

11

stepdown of visitation." Nevertheless, Vasquez reiterated his prior recommendation that the children remain in out-of-home care and the juvenile court terminate father's family reunification services and set a section 366.26 hearing.

In a second addendum report filed on August 24, 2020, the Department altered its recommendation as to Gi.D. The Department proposed that the juvenile court return Gi.D. to father "on a program of Family Maintenance services." Vasquez explained that father had "demonstrated an increased understanding of [Gi.D.'s] emotional well-being," "communicated safety to [Gi.D.,] gaining his trust and feeling of security," "done well with engaging [Gi.D.] in visitations by participating in activities [Gi.D.] prefers," and "show[ed] increased patience with [Gi.D.] during visitations[,] showing a greater understanding of his needs and emotional well-being." Gi.D. reported that he enjoyed visits with his father, looked forward to them, and wished to return to father's care. Further, Vasquez described some "challenges" in Gi.D.'s current foster placement and expressed concern that, if Gi.D. "cannot stabilize in his current placement, a new placement may need to be explored."

By contrast, Vasquez observed there had been "continued challenges" with regard to Z.H-M. and Ga.D. Specifically, Vasquez reported that during a family therapy session on August 14, 2020, father disregarded the therapist's coaching recommendations and continued questioning a reticent Ga.D. about in-person visits. However, an in-person visit between Ga.D., Gi.D., and father five days later (which was attended by a supporting, non-relative extended family member) went well.

B. *Contested, Combined 12-,18-, and 24-Month Review Hearing*

The juvenile court held a contested, combined 12-,18-, and 24-month review hearing from August 24–27, 2020. At that time, Z.H-M. was 12 years old, Gi.D. was 10 years old, and Ga.D. was nine years old.

Social worker Vasquez testified as an expert on risk assessment, placement, and permanency planning for dependent children and offered opinions consistent with the

12

Department's prior reports. Vasquez opined that returning Ga.D. to father's care would present a substantial risk to her. Vasquez explained the children had historically shown some resistance to visits and that, more recently, there had been considerable challenges regarding audio/video visits. Father had shown a lack of understanding and patience toward Ga.D.'s trauma history. Father also had shown a lack of accountability for his behavior and engaged in power struggles with Ga.D. during visits, which on occasion escalated to yelling, cursing, and deterioration in the relationship. Further, father sometimes struggled with managing Ga.D.'s behaviors at visits and with redirection provided by supervising personnel. Father had made comments to Ga.D. at visits that created a problematic dynamic, including telling Ga.D. she was rude and sending her out of visits. Some of these interactions occurred when Ga.D. brought up adoption, the number of visits, or her current placement.

Vasquez similarly opined that returning Z.H-M. to father's care would present a significant risk to Z.H-M. Z.H-M., off and on, had resisted visits with father. More recently, he exhibited increased resistance by declining to visit. Father showed a lack of understanding of Z.H-M.'s trauma history and a lack of accountability for behavior in visits. In addition, when all the children were together with father, he struggled to manage their behavior and lacked an understanding of his own behavior and how it affected the children.

Vasquez expressed a different opinion regarding Gi.D. Vasquez explained that, despite some historical challenges between Gi.D. and father, Gi.D. had become very aligned with father and father's behavior apparently affected Gi.D. differently than it did the other children. Gi.D.'s visits with father had improved drastically of late, and Gi.D. no longer resisted visits. Vasquez explained that father appeared to exhibit a greater understanding of Gi.D. and his trauma history, resulting in a better outcome for their relationship—in contrast to father's relationship with Ga.D. and Z.H-M. Vasquez also

13

noted that Gi.D. had had seven placements during the preceding 28-months of his dependency.

On cross-examination, Vasquez agreed that the children had opted out of visits often, especially during the COVID-19 pandemic. Vasquez observed a deterioration in the relationship among the children after the pandemic began. Vasquez opined that pointing out rude behavior is not necessarily inconsistent with appropriate parenting. Vasquez observed that father's comments during visits often elicited conflict between the children and father. Vasquez said, in his observation, father vocalized frustration during visits, which had a negative effect on the bond between the children and was contrary to father's stated intent to nurture them. In Vasquez's estimation, a majority of the visits between father and the children went well.

After father completed his cross-examination of Vasquez (but before the children's counsel could question Vasquez), father informed the juvenile court that he no longer wished to proceed with the contested hearing and was "submitting requesting of the case of the facts [*sic*] for the court, understanding" the Department's current recommendations for the children.

The next day, August 27, 2020, father withdrew his section 388 petition requesting unsupervised visitation with the children. In addition, father informed the juvenile court that he would not present any evidence and would allow the court to decide the matter based on the record before it. Father "believe[d] . . . all three of the children[] could be returned to his care" and "[did] not believe that reasonable reunification services ha[d] been provided."

Counsel for the children submitted on the Department's recommendations. Counsel expressed concern about the instability of Gi.D.'s current temporary placement and the potential impact of a move to another temporary placement. Counsel said Gi.D. "very much does want to go home with his father." In contrast, Z.H-M. and Ga.D. said they did not want to return to father's care. Counsel maintained that father had not been

14

able to successfully implement techniques for managing the children's specific needs despite having completed some services.

Ga.D. addressed the juvenile court directly. Ga.D. said she did not want to return home because she felt it was unsafe and she would not be very happy there. Among other things, Ga.D. said that father's poor treatment of his former partner made her nervous and scared and, as a girl, hurt her feelings. Ga.D. was worried about potential physical altercations with Gi.D., leaving school, and losing contact with other important people in her life because of father's opposition to them. On the other hand, Ga.D. said she felt safe in her current placement, which was calmer and had "no spanking, no hitting, none of that." Ga.D. also explained that at the recent in-person visit with father and Gi.D., she felt her boundaries were broken and COVID-19 precautions that had been promised were not followed.

C. *Juvenile Court's Ruling*

On August 27, 2020, after considering the Department's reports and the testimony of social worker Vasquez, the juvenile court adopted the Department's latest recommendations. The court reached its conclusion "based on the fact that the evidence shows that the children have significantly different needs and are differently situated."

The juvenile court noted that Gi.D.'s recent visits with father had gone well. Gi.D. was bonded to and trusted father, and he had aligned himself with father against Z.H-M. and Ga.D. The court explained that father's behaviors affected Gi.D. differently than they did his siblings, and Gi.D. had "a very unstable foster placement history, with seven different placements in the last two years." The court concluded that returning Gi.D. to father's care with family maintenance services would not present a substantial risk to Gi.D.

In contrast, the juvenile court explained that Z.H-M. and Ga.D. "ha[d] had extremely challenging visits with [father]." The visits "were not great before the COVID-19 pandemic [and] seemed to have gotten materially worse recently, with a lot of

15

conflict and blame coming from both directions." The court observed that father apparently behaved differently during visits with Z.H-M. and Ga.D. Father "blam[ed] the children, the caregivers and various service providers, displaying anger and aggression, rather than showing accountability for his own behaviors." The court explained that Z.H-M. and Ga.D. had a stable placement history and were bonded to their current long-term caretakers. In addition, Ga.D.'s behaviors had improved significantly after Gi.D. had been transitioned out of the caretakers' home. The court also noted that Ga.D. did not want to return to father's care and her memories of father's anger and physical abuse were still fresh in her mind.

The juvenile court found, by a preponderance of the evidence, that returning Z.H-M. and Ga.D. to father's care would present a substantial risk to their health, safety, and physical and emotional well-being. The court accordingly ordered termination of father's family reunification services as to Z.H-M. and Ga.D. and directed that a section 366.26 selection and implementation hearing be set. In addition, the juvenile court found, by clear and convincing evidence, that reasonable services had been offered or provided to father for all three children.

Father timely filed a notice of intent to file a writ petition. We stayed the scheduled section 366.26 hearing pending our decision on father's writ petition.

## II. DISCUSSION

Father contends that the juvenile court abused its discretion by concluding, based on the hearing evidence, that returning Z.H-M. and Ga.D. to his care and custody would create a substantial risk to their physical or emotional well-being. In addition, father maintains that he was not afforded reasonable reunification services with regard to visitation. The Department opposes father's claims, arguing that the juvenile court's ruling was amply supported by substantial evidence.

16

A. *Governing Law and Standard of Review*

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) "While reunification is the preferred outcome when it serves the interests of both parent and child, no interest is well served by compelling inadequate parents to shoulder responsibilities they are unwilling to accept or unable to discharge." (*Id*. at p. 1234.)

At the 12-, 18-, and 24-month review hearings, the juvenile court must return a child to the physical custody of his or her parent unless the court finds that return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.21, subd. (f)(1) [12-month review], 366.22, subd. (a)(1) [18-month review], § 366.25, subd. (a)(1) [24-month review].) At each hearing, the Department bears the burden to establish detriment by a preponderance of the evidence. (§§ 366.21, subd. (f)(1), 366.22, subd. (a)(1), 366.25, subd. (a)(1).) The detriment standard is " 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' It must mean what it says: that return presents a *substantial* risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.)

In this writ proceeding, we review the record to determine whether substantial evidence supports the juvenile court's finding of detriment. (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*).) "Substantial evidence is that which is reasonable, credible and of solid value." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238 (*T.J.*).) "When an appellate court reviews a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order. Additionally, we may not

17

substitute our deductions for those of the trier of fact." (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) "If there is substantial evidence to support the findings of the juvenile court, we uphold those findings." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).)

Regarding the provision of reasonable services, "[f]amily reunification services play a critical role in dependency proceedings. [Citations.] Reunification services should be tailored to the particular needs of the family." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425.) "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Id.* at p. 1426.) "Visitation is an essential component of a reunification plan. [Citation.] To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child." (*Ibid.*; see also § 362.1, subd. (a)(1)(A).) But "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).)

"At the 12-month and 18-month review hearings, the juvenile court may not set a section 366.26 hearing unless it finds by clear and convincing evidence that reasonable services were offered or provided to the parent." (*In re M.F.* (2019) 32 Cal.App.5th 1, 14; §§ 366.21, subds. (g)(1)(C)(ii), (g)(4), 366.22, subd. (b)(3)(C).) At the subsequent 24-month permanency review hearing, the juvenile court "shall determine whether reasonable services have been offered or provided to the parent or legal guardian." (§ 366.25, subd. (a)(3).) However, there is no clear and convincing evidence burden

18

stated in section 366.25 for the reasonable services determination required at the 24-month hearing.  (*Id*.; see also Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."])

We review the juvenile court's finding regarding reasonable services for substantial evidence.  (*T.J.*, *supra*, 21 Cal.App.5th at p. 1238; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)  The parties do not address in their briefing to this court whether the apparent different standard of proof for the reasonable services determination at the 24-month hearing should affect our review of the record for substantial evidence. Nevertheless, because the juvenile court stated its finding under the clear and convincing evidence standard after a combined 12-, 18-, and 24-month hearing, we will review the record for substantial evidence "account[ing] for the level of confidence" demanded by the clear and convincing evidence standard.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 (*O.B.*).)  Accordingly, "the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true."  (*Id*. at p. 1011.)  Our review of the record otherwise is conducted under the familiar principles for evaluating the sufficiency of evidence in support of a factfinder's determination.  (*Ibid*.)

B. *Analysis*

1. Risk of Detriment

We begin our analysis of father's claims by considering whether substantial evidence supports the juvenile court's finding that returning Z.H-M. and Ga.D. to father's care would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being.

Father argues that because he completed the court-mandated case plan services— which, in his judgment, were directed at intimate partner violence—the juvenile court should have returned Z.H-M. and Ga.D. to his care.  We are not persuaded.  Although father's commission of intimate partner violence was a main reason for the dependency

19

of the children in this case, the juvenile court sustained allegations concerning harm to the children that extended beyond intimate partner violence and found that the children came within section 300, subdivisions (a), (b), and (c). In addition, father's case plan services were not limited to intimate partner violence. The court-ordered case plan included programs focused on parenting in a nurturing and nonviolent manner and addressing father's broader challenges through individual counseling. Thus, both the causes of the out-of-home placement and the case plan services themselves involved more than just father's intimate partner violence.

Further, that father participated in and ultimately completed the components of his case plan over a two-year period is alone insufficient for us to conclude that there is no substantial evidence in support of the juvenile court's finding of detriment. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.) We acknowledge that father actively engaged in his case plan services and had made some progress toward ameliorating the causes for the children's placement. We also commend father for his efforts and commitment to his children. However, our review of the juvenile court's ruling is limited. (See *L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.) Here, substantial evidence in the record supports the juvenile court's finding that returning Z.H-M. and Ga.D. to father's care would create a substantial risk of detriment to them.

The juvenile court found that father blamed Z.H-M. and Ga.D. during visits and displayed "anger and aggression rather than showing accountability for his own behaviors." This finding is supported by the record. The evidence showed that, in addition to exhibiting ongoing confrontational behavior toward various service providers, father engaged in "power struggles" with the children, yelled and used foul language, sent Ga.D. out of visits, persisted in making statements about Z.H-M.'s and Ga.D.'s placement, and questioned Z.H-M. and Ga.D. about their visitation with him. The evidence also showed that father made inappropriate and aggressive comments toward Gi.D. during a visit at St. Vincent's while Z.H-M. and Ga.D. where present.

20

Based on the evidence, social worker Vasquez opined that father had not demonstrated a clear understanding of the need to make further behavioral changes to safely parent all three children, notwithstanding the progress father had made on his case plan. Given the substantial evidence of father's problematic behavior toward Z.H-M. and Ga.D., the juvenile court properly rested its decision, in part, on father's lack of insight into the reasons underlying the children's removal and failure to make appropriate behavioral changes during the reunification period. (See *Georgeanne G.*, *supra*, 53 Cal.App.5th at p. 867.)

We also are not persuaded by father's reliance on the opinions of other California Courts of Appeal in *In re E.D.* (2013) 217 Cal.App.4th 960, *Blanca P. v Superior Court* (1996) 45 Cal.App.4th 1738, *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, and *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646. These cases are materially distinguishable on their facts from the present case. For example, in *E.D.*, the Court of Appeal observed that "[t]here was no evidence that father failed to grasp any of 'the important parenting concepts' " and the juvenile court "did not cite *any* evidence" or explain the bases for its detriment finding. (*E.D.*, at p. 966.) In *David B.*, the evidence presented by the child welfare agency did not demonstrate any "lack of parenting skills" by the father and "even the social worker acknowledged he could not say [the father] lacked sufficient parenting skills." (*David B.*, at p. 791.) In *Blanca P.* and *M.G.*, the appellate courts explained that the social workers' opinions regarding the parents were vague, speculative, and not grounded in the evidence. (*Blanca P.*, at p. 1751; *M.G.*, at p. 663.) Here, there is substantial evidence in the record of father's continuing problematic behavior and lack of understanding.

Further, the juvenile court properly considered the effect of moving Z.H-M. and Ga.D. from their current placement and their desires to remain there when evaluating the risk of detriment to their well-being. (See *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–705 [effect of changing custody]; *In re Alvin R.* (2003) 108

21

Cal.App.4th 962, 974 [child's expressions and feelings about returning to a parent].) Z.H-M. and Ga.D. stated they did not wish to return home to father's care, and Ga.D. expressed fear about her safety with father and Gi.D. The juvenile court's findings concerning the stability and positive effects of Z.H-M.'s and Ga.D.'s remaining at their current placement are supported by substantial evidence. When juxtaposed with the evidence of Gi.D.'s wishes, his placement history, and the nature and quality of his present relationship with father, the evidence further supported the juvenile court's determination that Z.H-M. and Ga.D. had different needs and were differently situated than Gi.D., for whom it found returning to father would not present a substantial risk of detriment.

In sum, we conclude substantial evidence in the record supports the juvenile court's determination that returning Z.H-M. and Ga.D. to father's care would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. Thus, we must uphold the juvenile court's ruling.

## 2. Reasonable Visitation Services

We turn next to father's claim about his visitation with Z.H-M. and Ga.D. Father contends that reasonable services were not provided to him "because of deficits in the provision of visitation." He asserts there was "a chronic pattern of failure to meet" the juvenile court's visitation order, a failure of the Department to exercise its discretion to expand the minimum court-ordered visitation, and a lack of in-person visits after the onset of the COVID-19 pandemic. He contends that, over the period of the dependency, visitation was "persistently and consistently neglected," and therefore "it is no wonder that there ha[d] been degradation of the quality of visitation between parents and children." Father also maintains that the Department "failed to respond adequately to visitation barriers after COVID-19 restrictions were implemented."

"While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the

22

juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' [Citation.] This includes the 'possibility of adverse psychological consequences of an unwanted visit between [parent] and child.' " (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.) Moreover, the adequacy of the services and the reasonableness of the Department's efforts are judged according to the circumstances of the case. (See *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164; *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

With these principles in mind, we are not persuaded by father's contention regarding the Department's provision of visitation. Simply put, father's various assertions are not supported by the record, and there is substantial evidence of the reasonableness of the services provided. Throughout the dependency, the Department consistently reported to the juvenile court about the status and nature of the visitation under the court's visitation orders. The Department's reports were comprehensive and documented both the challenges surrounding visitation related to father's behavior and the Department's efforts to address them. As for the quantity of visitation provided to father, in December 2019, father claimed he was owed four hours of missed visitation with Z.H-M. and Ga.D. In response, social worker Vasquez said he would rectify the situation by "mak[ing] up this time" during the children's upcoming school holiday break.[9] Similarly, in March 2020, Vasquez reported that father was owed six hours of visitation with Ga.D. and seven hours with Z.H-M. Vasquez again said he would continue working with father to make up this visit time, and father has not directed us to anything in the record demonstrating that Vasquez failed to pursue this commitment.

_____

[9] We note that a spreadsheet in the record that father had submitted with his withdrawn section 388 petition for unsupervised visitation purports to document the hours of visitation provided to father between December 30, 2018 and December 28, 2019. The spreadsheet appears to substantially overstate the shortfall in the visitation hours. The overstatement occurred because the spreadsheet did not include the correct number of visitation hours ordered by the juvenile court during the analyzed period.

Further, after the onset of the COVID-19 pandemic and the related county- and court-mandated restrictions in mid-March 2020, father was provided more than three dozen audio/video visits with the children before the end of June 2020.[10]  In mid-June 2020, the Department restarted in-person visiting and, as father concedes, made efforts to address Z.H-M.'s and Ga.D.'s reluctance to visit with father.  Those efforts included enlisting the help of Z.H-M.'s and Ga.D.'s clinical support teams and caretakers (who agreed to encourage visitation).  In addition, Vasquez encouraged Z.H-M. and Ga.D. to visit with father.  He also continued scheduling telephone call visitations three times per week and made in-person visits available to Z.H-M. and Ga.D., even though they had refused them.  Relatedly, Vasquez failed to find support for father's assertion that Z.H-M.'s and Ga.D.'s caretakers were attempting to undermine reunification, and the juvenile court concluded that father was "blaming the children, the caregivers and various service providers" instead of holding himself to account for his behavior.

In our judgment, the evidence does not demonstrate, as asserted by father, either "a chronic pattern of failure to meet" the juvenile court's visitation order or that the Department "persistently and consistently neglected" visitation for two years.  Rather, the evidence shows the Department made consistent and reasonable efforts to maintain contact among the family and address visitation issues as they arose throughout the dependency.  Although the COVID-19 pandemic, resultant audio/video visitation, and the children's resistance to visits added significant and unfortunate complications to the provision of visitation services, there is substantial evidence demonstrating the

---

[10] At a trial management conference on August 6, 2020, father's counsel complained about the "enormous" number of missed and disrupted visits in the preceding six months.  However, counsel acknowledged that he had not yet submitted an accounting to the court or the Department "about how many visits have been missed and why in the last six months and the visitation [*sic*] has been absolutely horrendous."  The record does not include any such additional submission by counsel.

Department made reasonable and diligent efforts to address those challenges and continued providing reasonable visitation under the circumstances.

In sum, we conclude "the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable" that the Department provided father reasonable visitation services. (See *O.B.*, *supra*, 9 Cal.5th at p. 1011.) Therefore, we must reject father's claim and uphold the juvenile court's ruling.

### III.  DISPOSITION

The petition for extraordinary writ is denied.  This court's November 24, 2020 stay order is vacated.  This decision shall be final immediately upon filing.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
Danner, J.

WE CONCUR:


_____
Greenwood, P.J.




_____
Grover, J.




**H048420**
*J.R. v. Superior Court*